I'd like to reserve two minutes for rebuttal. Right. You watch your clock. All right. Thank you. May it please the Court, my name is Mike Gosler. I represent Airborne Freight, the appellant in these proceedings. Just very quickly, by way of background, this is an appeal of a summary judgment decision by the district court on two coverage defenses arising out of a claim by Airborne Freight on a cargo legal liability policy. This was a manuscript policy that was crafted specifically to cover the risks that were being underwritten arising out of Airborne Freight's business. And Airborne has a contract, as I understand it, with NFI and with Sur La Table that has arrangements with them and then a contract with the United States Postal Service that you say is part of the coverage. Correct. Where's the contract between Airborne and USPS? I couldn't find it in the record. The specific master contract itself is not in the record. How do we know what terms and conditions and responsibilities Airborne has vis-à-vis USPS and vice versa without the contract? Those are described in the Airborne NFI, basically in the at-home service agreement. It contains provisions that describe the various roles of the parties and specifically defines the role of the U.S. Postal Service. That relationship was also described in the testimony of Lynn Gregorich, which is excerpted and included in the record. But specifically, the at-home service agreement contains provisions. I believe the fourth recital generally describes its role, and then there's language near the end of the service agreement itself that describes the relationship of the U.S. Postal Service. I think in paragraph 42, it references that Carrier, which in this instance is ---- Could you give us a citation to the excerpt? Yes. This would be excerpt for the record 6, page 13. Page what? Page 13. And it's basically, it's the second page of the three-page at-home service agreement. And the first page, the last recital references the role of the U.S. Postal Service acting basically as the last leg in the process in delivering the packages to the consignee, the consignee being the term used to describe the ultimate party who is receiving the package, the customer, in other words. And then in section 42, it references that the carrier, which is in this instance airborne, will automatically pay the U.S. Postal Service for all at-home shipments listed in the date transmissions as though they were a package tendered. And then the shipper shall pay the carrier the full shipping charge for each data-recorded transmittal. So in other words, the way the contract worked was airborne contracted with the Postal Service to provide the last leg of the delivery process, just like it also contracted with commercial airlines, in some instances to move packages from point A to point B. It contracted with other independent truckers to move packages. There were a number of third parties that airborne contracted with. Did the U.S. Postal Service pay airborne for insurance? No. Could you translate to the supplemental excerpt of record page 6, the assured and scope of coverage clauses? Yes. Under assured, do you contend that the contract agents of the insured, that U.S. Postal Service is covered by that clause? No. So your argument has to do with paragraph 2, the scope of coverage. Correct. Yes. We're not arguing that the Postal Service. I remember now why I was very concerned when I was a lawyer and tried these cases, because I'm having trouble understanding what that paragraph means. Can you tell me, as I understand it, it's arising under a contract, and then there's a whole Is that how you argue your case? Yes. I would not argue. It says while their case is under custody and control, their case refers back to these lists which include, in your interpretation, U.S. Postal Service. That's correct. We're not arguing that the Postal Service is a named or an additional insured under paragraph 1, but we are arguing that they're an agent for purposes of being within the care or care custody and control of airborne under section 2. So we're not worried about addition or short. You're saying that there's a direct coverage as an agent of your company. Correct. And that's your policy. That's right. And that's sort of the last sentence in the scope of coverage clause is important, because it specifically indicates the party's intent that the insurance attaches from the moment the insured becomes responsible and or liable and continues until such responsibility or liability ceases. And it ceases, it begins when the package is picked up, and it ceases when the package is actually delivered to the customer, regardless of who in the delivery chain actually has physical possession of it at any given point in time. So it's the same Airbill use on the package the entire way? Yes. Yes. That's also, I think, covered in the Airborne Express Service Guide, which is supplemental SCR 76 is where you find that in the record. But that actually describes generally the process. And it's also described. I have a slightly different question for you on the insurance. Was Airborne required to report to the insurance company each loss of a package or damage to a package? No. There is a provision, there was a protocol that was agreed upon early on in the process, and I believe it's actually incorporated into the insurance policy, where only demands that exceed $50,000. Yeah, this is in, again, this would be ER 7, page 13 in the general conditions section of 9C, requires the insured to give prompt notification in writing to St. Paul of notice of suit in which the damage demand exceeds $50,000. So they basically set forth a protocol with a minimum, and beyond that, there was no direct reporting requirement. The, the, the. Let me see if I understand. On your deductible argument, as I understand it, it deals with interpretation of the word claims. Correct. It struck me as rather illogical, and that's why I'm asking the question, because it would leave Airborne in a position, or any company that has a lot of claims, of just holding on to them and always being able to overcome a deduction, which seems to me would do away with the deduction. So I didn't see the logic of it, but where do you get it in the policy, the definition of claims allowing you to put all the claims together to get over the deductible? Well, there is no definition of a claim in the policy itself. I looked several times, and I'm sure if there was, one counsel would have pointed it out to us. The fact of the matter is, the parties, this is a manuscript policy, and for whatever reason, the parties simply chose not to define the term claim. As such, the policy, to the extent it's ambiguous, has to be construed against St. Paul as the insurer. When you say manuscript policy, do you mean that's other than a standard foreign policy that, say, ISO would provide, the insurance organization? Correct. You would not find this form anywhere out there as an ISO form. This was purely a creation, a contract that was created to cover this specific risk by St. Paul in favor of Airborne. Why do you say it's ambiguous? I did this kind of work for years, and everybody knew what a claim was. It was claims what rises out of an insurance contract. Don't you have to go someplace else to find an ambiguity? No. I don't know that it is ambiguous, Your Honor. What the case law says is that if the term's not defined in the contract, then you would give it its ordinary meaning, and then you look at the dictionary. And both Black's law and Webster's is referenced in our briefing, defines a claim as a demand for payment. It also goes on, the Safeco case that we cited also goes on to define a claim as a demand in the context of a lawsuit. And so what we have here is an insurance contract that obligates St. Paul to pay on claims. It doesn't define the term. It's certainly a demand for payment. And it's a demand in the form of a complaint that seeks damages not based upon each individual customer complaint, but rather the demand, the prayer or the request in the complaint under the breach contract claim seeks damages for a whole variety of damages. Extra labor costs that was incurred in reprocessing the packages that were allegedly not delivered, replacing the goods, replacing inventory, a whole series of damages that aren't specific to any individual package. They're part of the demand. They're part of the lawsuit. They're part of basically the occurrence that the parties or the circumstances that gave rise to the lawsuit itself. Can you look to the typical use in the industry in defining a term, if you consider it ambiguous, is the way it's always considered in the industry? Something can be considered in defining an ambiguous term. I don't know if there is a commonly accepted definition in the industry. I know that, for example, on this care, custody and control issue, depending on the type of policy that the language appears in, it can mean any variety of things. But back to the demand, I think a demand or a claim generally is considered to be a demand for payment. And if it occurred in the context of a lawsuit here, as I say, where there are a variety of damages being sought. So I take it there's no, nothing in the record to show any industry practice. There is none that I can recall. I'm over time. Thank you. Thank you. Counsel. Good afternoon, Your Honors. May it please the Court. John Hayes on behalf of St. Paul Fire and Marine Insurance. If I could just address some of these questions before I get into my main comments, I would like to take the opportunity to do so. On paragraph 7 of the insurance policy, which is SCR 8, it does give you a working definition of the. Paragraph 7? Yes. Of which supplemental excerpt at what page? Page. Page. And it reads under the heading claims and claim procedures, quote, in the event of any occurrence which may result in loss, damage, or expense, for which the company is or may become liable. Under claim procedures? Yes. And which paragraph, subparagraph? It's the first paragraph under the heading. All right. Thank you. And it says, in effect, whenever there's an occurrence which may result in a loss for which the company is or may become liable under this insurance, notice thereof shall be given to the company as soon as practicable. So to answer your question, Your Honor, there is notice requirement for each claim. Whoa, whoa, whoa. How does the policy define occurrence? There is a definition of occurrence in the policy. I'm struggling here to find it. It's on SCR 12 under the definition section, Your Honor. Was this an issue in the – before the Court as to whether the loss of an individual package constituted an occurrence within the meaning of this contract? All I can tell you, Your Honor, it was briefed. I do not know all the reasoning of the trial court in granting summary judgment  And if occurrence – It seems to undermine your very argument because it says any number of damage or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence. And we don't have common causes here. We have over 4,000 separate causes. Well, that's the issue in dispute, isn't it? No, Your Honor. There's no fact – It wasn't the – didn't they all get injured because of – didn't the two – I guess the two – Solitab and the other company, didn't they suffer the injury for which they sued Airborne because of some flaws in the UPS procedure? No, Your Honor. Nobody knows what happened within the postal service to these packages. We don't know if they were misaddressed. I know there's something in common, right? For all the injury that Solitab had and for all the injury the other company had, they had something in common. These were packages that were sent through this program that Airborne came up with to use the UPS. That's correct, Your Honor. All right. Over 18 months, these packages were lost. Nobody knows the cause of each package. There was no means to track them. No, but your contract kind of sets it up nicely so that you don't really need to know because your definition of occurrence kind of bundles it all up into one. Well, Your Honor, if there's any dispute about what it means, I would refer you to the practice of the parties over four years leading up to these events. And we placed in front of the Court the record of how the parties dealt with each lost package over time. There's no dispute that up to this time, each package was subject to one deductible. Each package was considered an occurrence. There was never any bundling of claims in the whole history of the relationship between these parties until this event with this customer. So did Airborne get notice of each of these individualized claims? Absolutely. And they aggregated them? Or did NFI bring the lawsuit and then found out about it? The way it came in initially, Your Honor, is NFI gave individual notice of every lost package. The paper trail from NFI to Airborne shows an individual discrete notice. So as a matter of practice, then, if there were over a period of, say, a month or two months, there were daily claims by NFI for non-delivery of fulfillment so that they had one or two a day, is it your contention that every one of those inquiries or claims by NFI should have immediately or promptly been forwarded on individually to St. Paul? That's what the insurance contract says, and that's what the parties did up until this event with NFI. It's really worth looking at something else here, Your Honors. With respect to the dispute with this customer, there were over 4,000 claims. It's really instructive to see how Airborne dealt with the first 700. They paid the claims. Over $40,000 worth never submitted one of them to St. Paul for coverage. It's only when they realized the customer was likely in deep problems about payments that they decided to go with a different strategy. For the first 700 of the 4,000 claims with this customer, Airborne treated it like they have historically treated each claim with St. Paul, subjected it to one deductible. The deductible obviously is not met because it's $2,500 and no one claim is more than 100. And it's the past practice of the parties here that's truly instructive. The counsel is going to argue ambiguity at all. The past practice of the parties was to use each lost package as a single claim subject to a deductible. And I would refer you to S.E.R. 255-258, which shows that historical record where, for each lost package, a deductible was applied. That's not disputed in the record. So any argument about multiple occurrences being collapsed into one occurrence or packages allowed to be aggregated subject to one deductible is totally dispelled by the practice between the parties. And to me, that's dispositive. You have parties who knew full well how to interpret this insurance contract. If I could just address the care, custody and control element, which the trial court did grant summary judgment on, the one point I want to make is that Washington law governs the interpretation of care, custody and control. In Washington, for a property to be in the care, custody and control of an insured, they must have supervision over the property. It's not disputed in the record that once these packages were delivered to the Postal Service, Airborne had absolutely no control. Similarly, the argument that the Postal Service was somehow an agent of Airborne is misplaced. Agency requires some ability to manage the performance of the agent. That's why I was asking about the – there's a contractual relationship between Airborne and USPS. And I think, as I recall, you said in your brief that these were the normal contracts, subcontract carriers. There could clearly be coverage, but because it's USPS and a governmental agency, they aren't within it. Now, that's what I wasn't quite sure I understood. But it's clear that part of the delivery to the customer, which is the normal operation of Airborne, is in this situation being carried out by USPS. But it could have been by Joe's home delivery service. And you say the latter case clearly would have been covered, but not the former. Why is that? It's the contract language in the policy, Your Honor. What is that? The custody and control and supervision, that's what you're relying on. Correct. And you're sure that they had no ability to complain or had no relationship with the USPS? There's no evidence at all on the record that Airborne did anything other than deliver the packages to USPS and walked away. There was no ability to track any packages. Airborne had the opportunity to further insure. They declined. There was absolutely no control over the packages once the Postal Service received them. Is that why the district judge found there was no showing, no proof? That is, there is no proof of this supervision, and that's why he decided the way he did? That's correct. On the relationship. Washington law requires supervision. Yes. And he also found there was no agency proof for the fact that Airborne could not manage the performance of the Postal Service. And when you think about it, Your Honor, it would make the Postal Service an agent of each one of us. Every time we delivered an envelope for mailing. And, of course, that's absurd. See, that's. We have a contract. When I put an envelope in a post box, there's no contract. But there was a contract between USPS. Yes. Airborne, there's a, you know. So that implies that it's different from just sticking it, you know, going to any postal office and putting it in the mail. But it's a distinction between that relationship, whatever it may be, and an agency relationship. Well, the distinction for me is between what would be, what is the distinction between the role USPS is playing and any other subcontractor that Airborne's using to get it from Airborne's possession to the ultimate destination, which in all cases is the consumer. Well, for one thing, Airborne controls its own freight forwarders, its own employees, its own third party. Even if they're independent contractors? It has control over them. It can fire them. It can redirect them. Presumably it could fire USPS. Doesn't USPS get money for this? I presume they do, Your Honor. Who paid them? I presume the ultimate customer paid for the charges incurred by Airborne from the U.S. Postal Service. I can't imagine that Airborne was a volunteer. So we do have a breach of contract, arguably, with the Postal Service. But they're certainly not agents or independent contractors. And I would also like to close with the fact that regardless, there's no way Airborne can show that the deductibles have been made for each claim. There's no dispute the historical practice was that each loss package was subject to a $2,500 deductible at a minimum. It's undisputed. I'm having a problem with the notion of applying Washington State law to the definition of care, custody and control in this context, in a cargo liability insurance policy. We do have that quote from Couch, the Treatise on Insurance Law, which says that in that liability or responsibility for the package. We also have a Washington case, Old Olympic v. Centennial, and the Vitamilk case, both of which clearly state care, custody and control under a liability policy require supervision. The ability to supervise. Is there a cargo liability? No. It's a general liability. Is there any cases that interpret that term in a cargo? No, Your Honor. Neither myself nor counsel for Airborne has been able to find any other authority in Washington for a cargo case. But I would point out that the precedents in Washington had to do with care, custody and control of property for insurance coverage purposes. Right. But cargo is, you know, it's a different situation because the package is in transit. And even USPS is responsible during the entire duration when a package is in transit under some ordinary contractual relationship with an individual. I would think Airborne would have a claim against Postal Service. I don't know why they did not pursue it. Arguably, they didn't deliver packages delivered to them, but there's a lot of issues about misaddresses. Yeah, but maybe they didn't pursue it because they had insurance to cover it. Anyway, you're two minutes over your time, two and a half minutes. And I'll give counsel another minute because he devolves time with questioning. So thank you. Thank you, Your Honors. Two comments. Airborne did pay the U.S. Postal Service. NFI did not pay the Postal Service. The customer did not. That was what I was referring to earlier in the at-home delivery contract where it references that part of what Airborne does is pay the post office. But the second point I'd like to make on care, custody, and control is that Airborne had no more supervisory control over commercial airlines, customs brokers, independent truckers, or freight forwarders than it had over the Postal Service. In each instance, what Airborne did is instructed those entities where to send the principal distinction. St. Paul admits as it must that had these packages been lost in the custody of a commercial airline, it would have to pay. But it argues that because it's the Postal Service, there's some difference. And I argue there is no principal means of distinguishing those two on any basis whatsoever. There's no more control over an airline than there is over the United States Postal Service. So you're asking us to look at the contract and not Washington state law covering property insurance. I don't think so. The CGL case law that is cited by counsel is simply not applicable in this context. It involved exclusions of coverage, not grants, and it involved a completely different setting, a first party versus third party liability cover versus what do the It's not a standard form ISO policy, but rather it was specifically crafted to deal with the type of risk that the parties understood was taking place. And that's why I think the other fact that's important to keep in mind is Mr. Riley's e-mail informing St. Paul that the at-home delivery program was being developed because of the potential increase in the risk that it presented to St. Paul. That was sent to underwriter Becky Marshall. It's in the record. It's very important because the broker is highlighting this new risk arising out of this program that falls within the cover. And they renewed the policy several times after that. Thank you. Can I just ask one follow-up? Sure. Go ahead. Is it your position that even if we had the USPS airborne contract, it would not establish that you had any more control or supervision over them than you would United Airlines? That's correct. So we wouldn't find anything in there. That's correct. Is there a stipulation in the record that the insurance company would have paid claims if it had been lost by United Airlines or some other carrier? There is admission in the briefing that independent third parties such as airlines are covered. I think Counsel Price still argued the same deductible defense, so I don't want to extend it. Is there a stipulation in the record is my question. No, but I would suggest there is a judicial admission in the form of what they write in their brief where they acknowledge that independent third parties are covered except the Postal Service. It's in, I believe, their opening brief. Well, St. Paul could cover them differently. They just charge premiums differently. That's the whole idea of the premium structure. I don't quite get your argument that because some party that's not before the Court, they do it one way, necessarily they have to do it that way with you. Maybe I'm not being clear, but St. Paul in its briefing acknowledged that if a loss – if packages had been lost while in the possession of an independent trucker or an airline, that that loss would be covered. What they're arguing is that the Postal Service is different. And my point is there's no principled basis to distinguish the Postal Service from any of those, from any kind of a supervisory or control aspect. Thank you. All right. Thank you, counsel. Airborne Freight Corporation v. St. Paul Fire and Marine Insurance Company is submitted. And we will hear United States v. Gonzalez. Thank you, counsel.
judges: Wallace, Wardlaw, Fisher